AO 91 (REV.5/85) Criminal Complaint

AUSA MARK E. SCHNEIDER (312) 353-5356
AUSA LINDSAY JENKINS (312) 353-0962

# UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA **F I L E D**

v.

**CRIMINAL COMPLAINT**

FILED
2-13-08
FEB 1 3 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE VALDEZ

YOHANCE JOSEPH LACOUR,
a/k/a "Famo"

CASE NUMBER:

**08CR  0127**

I, Eric J. McIntosh, the undersigned complainant, being duly sworn, state the following

is true and correct to the best of my knowledge and belief. Beginning not later than in or

about June 2007 and continuing through December 2007, in Cook County, in the Northern

District of Illinois, Eastern Division, and elsewhere, defendant did

> conspire with others to possess with intent to distribute and to distribute a
> controlled substance, namely, in excess of 100 grams of mixtures and substances
> containing heroin, a Schedule I Narcotic Drug Controlled Substance, in violation
> of Title 21, United States Code, Section 841(a)(1);

in violation of Title 18, United States Code, Section 846, and Title 18, United States Code,
Section 2.

I further state that I am a Special Agent, Federal Bureau of Investigation, and that this
Complaint is based on the following facts:

**See Attached Affidavit.**

Continued on the attached sheet and made a part hereof:   _X_ Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

February 13, 2008
Date

at   Chicago, Illinois
City and State

MARIA VALDEZ, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

1

STATE OF ILLINOIS    )
                     )
COUNTY OF COOK       )

## AFFIDAVIT

I, Eric J. McIntosh, being first duly sworn on oath, depose and state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed for four years.  I am currently assigned in the Chicago Field Division to a Criminal Enterprise Squad, which investigates drug crimes, and have been so assigned for approximately one year.  I have received training in the enforcement of laws relating to controlled substances, including detailed instruction in the areas of drug identification, investigative techniques, undercover operations, informant development and handling, physical and electronic surveillance, the authorized interception of wire communications, and debriefing defendants, witnesses and informants, as well as various methods and procedures utilized by drug organizations to illegally import, transport and distribute controlled substances and to launder and conceal proceeds from drug trafficking.  In my role as a Special Agent, I have participated in numerous investigations relating to the illegal trafficking and distribution of controlled substances. Based on my knowledge, training and experience, I am familiar with the ways in which drug traffickers and their associates conduct their drug-related business, including, but not limited to, their methods of distributing narcotics, their use of telephones, their use of codes and code words to identify themselves, and the nature of their communications.

2.      References are made in this affidavit to judicially-authorized interceptions of telephone communications.  In many of the intercepted calls, coded language was used to conceal the true nature of the telephone calls.  At various points in this affidavit, I have placed in brackets

1

my understanding of what was being said during intercepted calls. My understanding is based on the contents and context of the conversations, my experience as a law enforcement officer and the experience of other law enforcement agents and officers in this investigation. The times listed for these calls are approximate. Finally, the summaries below do not include all potentially criminal calls intercepted during the period of interception, or all statements or topics covered during the course of the intercepted conversations. They are also based upon preliminary transcripts and/or linesheets and may not represent the entire conversation that occurred between the identified individuals.

3.　　The information contained in this affidavit is based on my conversations with and review of reports prepared by agents in the FBI, as well as other federal agencies and other law enforcement agents and officers, the results of physical surveillance, phone records, conversations intercepted pursuant to Court orders authorizing the interception of wire communications, and other investigation. Since this affidavit is being submitted for the limited purposes of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

4.　　This affidavit is made for the purpose of establishing probable cause in support of a criminal complaint charging YOHANCE JOSEPH LACOUR a/k/a FAMO ("LACOUR") with conspiring with others known and unknown to the United States to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, in excess of 100 grams of mixtures containing heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

## BACKGROUND OF THE INVESTIGATION

5.      The FBI is investigating the drug trafficking of LACOUR and multiple co-conspirators, who have been operating in the Chicago area and elsewhere.  As described below, LACOUR has been intercepted in numerous drug-related communications using phones subject to court-authorized wiretaps.  Specifically, the wiretaps and related investigation have revealed that LACOUR supplies wholesale quantities of heroin to a St. Louis-based co-conspirator, Individual A. Further, LACOUR has been intercepted discussing his drug-trafficking activities relating to Individual A with Individual C, a member of the Black Family Mafia drug-trafficking organization in Atlanta, Georgia, and coordinating marijuana sales with various Chicago-based subjects.

6.      Among the judicial orders authorizing the interception of wire communications employed as part of related nationwide investigations are the following:

a.      On or about June 8, 2007, Judge Rodney W. Sippel, U.S. District Court, Eastern District of Missouri, entered an order (the "6-8-2007 Order") authorizing the interception of wire communications, for a period of thirty days, to and from cellular telephone number **314-723-7343**, used by Individual A.  Pursuant to the 6-8-2007 Order, the Drug Enforcement Administration ("DEA") conducted interceptions from approximately June 8, 2007 through and including July 7, 2007.

b.      On or about August 1, 2007, Judge Stephen N. Limbaugh, U.S. District Court, Eastern District of Missouri, entered an order (the "8-1-2007 Order") authorizing the interception of wire communications, for a period of thirty days, to and from cellular telephone number **314-973-6580**, used by Individual A.  Pursuant to the 8-1-2007 Order, the DEA conducted interceptions from approximately August 1, 2007 through and including August 30, 2007.  During the period of

interceptions, Individual A ceased using **314-973-6580** and began using cellular telephone number **314-973-5548**, which utilized the same Electronic Serial Number (ESN) as **314-973-6580**. Consistent with the 8-1-2007 Order, interceptions were then conducted on the replacement phone **314-973-5548**.

      c.     On or about November 5, 2007, Chief Judge James F. Holderman, U.S. District Court, Northern District of Illinois, entered an order (the "11-5-2007 Order") authorizing the interception of wire communications, for a period of thirty days, to and from **773-858-3254 ("Target Phone 1")**, used by LACOUR. Pursuant to the 11-5-2007 Order, the FBI conducted interceptions on **Target Phone 1** from approximately November 5, 2007 through and including December 4, 2007.

      d.     On or about December 27, 2007, Acting Chief Judge Robert W. Gettleman, U.S. District Court, Northern District of Illinois, entered an order (the "12-27-2007 Order") authorizing the interception of wire communications, for a period of thirty days, to and from **Target Phone 1**, used by LACOUR. Pursuant to the 12-27-2007 Order, the FBI conducted interceptions on **Target Phone 1** from approximately December 27, 2007 through and including January 15, 2008.

## INTERCEPTED CALLS AND RELATED INVESTIGATION

**A.**    **Intercepted Communications Pursuant to 6-8-2007 Order Relating to Heroin Delivery from Lacour to Individual A and Seizure of Heroin**

      7.     On or about June 12, 2007, at approximately 11:39 p.m., Individual A placed an outgoing call from **314-723-7343** to LACOUR at telephone number **773-414-6221**. (The identification of LACOUR is described in detail below.) **773-414-6221** was subscribed to an "Asa Gordon," thought to be a fictitious name used to activate the phone.

8. During the call, Individual A said, "What's up FAMO?" LACOUR replied, "What's going with it my niggar?" Individual A told LACOUR, "I'm trying to see what the deal is. I called [Individual C] but his phone is off." LACOUR asked, "Are you ready [to purchase narcotics]?" Individual A answered, "Yeah, you know me." LACOUR answered, "Let me call him [Individual C] and then call them people [LACOUR's source of supply] and see if we can't settle it for tomorrow." Individual A responded by telling LACOUR to call [Individual C] and "let me know if everything is still good and I'll call and let you know what day I could come." LACOUR answered, "OK cool." Individual A responded, "but this time ask [Individual C], just ask him, see what he say, if I could get the whole thing [one kilogram of heroin] for the 80 [$80,000]. If he can't, I'll just have to come up with the 85 [$85,000]." LACOUR replied, "OK, you ready for the whole thing [the kilogram of heroin]?" Individual A responded, "Yeah." LACOUR answered, "I'm gonna ask him. I'll hit you back. I'll let you know what's up."

9. On or about June 12, 2007, at approximately 11:54 p.m., Individual A received an incoming call on **314-723-7343** from LACOUR on **773-414-6221**. During this call, LACOUR told Individual A that "he [Individual C] said niggar need that 85 [$85,000]." Individual A responded, "well I ain't got the whole 85. I just got the 80." LACOUR told Individual A, "I'll ask him [Individual C] if it possible to run it and you bring the five [$5,000] back." Individual A responded, "Yeah, you know I do that. I don't have a problem doing that whatsoever." LACOUR told Individual A, "You know that's going to be cool." LACOUR also said, "I have your extras [narcotics] and price some more if you want to, uh, you know what I'm saying, do the same type of thing [bring the money back to LACOUR at a later time] with that but I have to count them. I have your extra 20, right." Individual A responded, "yeah." LACOUR continued, "On top of that he

5

might have 40 to 50." Individual A asked, "Extra?" LACOUR responded, "Yeah, if you want to run them [narcotics] and just bring it [money] back." Individual A said, "You know I ain't got a problem looking out for you all, you know what I'm saying. If you want to just give it [front narcotics] to me, just, and whatever you want for them [narcotics] I will run it [money] back to you." LACOUR said, "For sure." Individual A said, "I have no problem doing that." LACOUR said, "For sure, for sure. Well, I'm going to tell them [source of supply], I'm going to hit them back and tell them I'm gonna [unintelligible] those extras [a quantity of narcotics] and then as far as that, I'm sure it will be all good for you to bring that 80 [$80,000]." Individual A said, "I will just run the five [$5,000] back. He [Individual C] knows that I'll just run the five back." LACOUR said, "Exactly. That's what's up and let me know what day you are coming down." Individual A responded, "Okay."

10.    On or about June 13, 2007, at approximately 3:31 p.m., Individual A placed an outgoing call on **314-723-7343** to LACOUR on **773-414-6221**. During this call, Individual A said, "Yeah, I want to leave early in the morning man." LACOUR responded, "You want to leave out in the morning." Individual A answered, "Yeah." LACOUR said, "Okay, it's all good." Individual A asked, "Is that cool what you and me talked about, you know, how we said we're going to do that?" LACOUR replied, "Let me, uhm, you know, I already got the extras [narcotics] so that's no problem. I told [Individual C], he said that he's got to make a call and he said he think so but let me make double sure and let's talk this evening." Individual A responded, "I'll [unintelligible] early in the morning."

11.    On or about June 13, 2007, at approximately 6:10 p.m., Individual A received an incoming call on **314-723-7343**, from LACOUR on **773-414-6221**. During this call, Individual A said, "What up FAMO [LACOUR]?" LACOUR said, "Hey, he [Individual C] said it's all good, he's

just, you know, gonna need it [money] when you get back." LACOUR asked, "What time are you leaving?" Individual A said, "I'm gonna leave early, about 8:00. The last time, you know, I ain't say nothing, but last time, weigh it [heroin] without the bag because last time it was six g's [six grams] off, and I don't want to just keep on complaining, you know what I'm saying, that it was off, cause I just keep going with the flow but last time it was six off, I ain't tripping off it. But next time just weigh without the bag though." LACOUR said, "Okay, and you know what, I got me, ah, uhm, another, one of them little things, a little sealer, so we'll be able to do it all up." Individual A said, "Okay, this is what I'm gonna do, I'm going to leave at about 8:00." LACOUR said, "Huh? you gonna leave about 8:00, that will put you here about what time?" Individual A responded, "about 12:00."

12.    On or about June 14, 2007, at approximately 12:05 p.m., Individual A received an incoming call on **314-723-7343** from LACOUR on **773-414-6221**. During this call, Individual A told LACOUR "about another hour or so [estimated time arrival to Chicago, Illinois]. It is what it is." LACOUR responded, "Okay, you know where it will be." Individual A responded, "Okay."

13.    On or about June 14, 2007, at approximately 10:10 p.m., the Collinsville, Illinois Police Department, working under the direction of DEA agents familiar with the investigation, conducted a traffic stop of a vehicle occupied by Individual A, Individual D and Individual E, headed southbound to Missouri. A narcotics detection canine indicated positively for the presence of a narcotics odor on the vehicle. Individual A, Individual D and Individual E were told that the car would be detained, but that they were free to leave. Subsequently, Individual A, Individual D and Individual E were picked up and left the area without making any statements. During a search of the detained car, on June 15, 2007, at approximately 12:07 a.m., officers discovered a hidden

7

compartment built into the dashboard of the car.  The compartment contained two large, approximately one-pound bricks of high-grade heroin, numerous capsules of suspected heroin, and several cigars appearing to contain marijuana. No charges were brought at that time to protect the ongoing investigation.  Subsequent DEA laboratory analysis confirmed that one brick of approximately 405 grams was 81.3% pure heroin and one brick of approximately 432 grams was 74.6% pure heroin.

14.    On or about June 16, 2007, at approximately 10:03 p.m., Individual A placed an outgoing call on **314-723-7343** to LACOUR on **773-414-6221**. During the call, Individual A told LACOUR, "that phone I had, man, somehow I lost that motherfucker, that's one reason I called you too. I need to get that chirp [cellular telephones with push to talk capabilities] so we can stop talking on these phones." LACOUR assured Individual A that it was okay and that when Individual A returned "we'll go get you a fresh one. Because the whole thing is he [Individual C] wanted us to." Individual A interrupted, "I know that's why I knew I lost it, I was so motherfucking mad at myself." LACOUR then told Individual A, "It's all good.  As long as you know it did not wind up in no bad hands." Individual A affirmed that he knew that it did not. LACOUR again told Individual A that "we all good then, we all good, that ain't nothing but a thing, we just go grab another one."

**B.    Identification of Target Phone 1 and Intercepted Calls Pursuant to 8-1-2007 Order Relating to Heroin Transaction Between Individual A and Lacour**

15.    On or about August 3, 2007, at approximately 3:00 p.m., an FBI Special Agent acting in an undercover capacity placed a recorded outgoing call to **Target Phone 1**, which had been identified base upon call activity similar to **773-414-6221**, a phone used by LACOUR. During the call, the person who answered **Target Phone 1** disclosed that his name was "Joseph" and that he

resided in Chicago, Illinois.  A voice comparison by agents who listened to this call and calls previously intercepted of LACOUR, utilizing **773-414-6221**, indicated the individual using each telephone to be the same.

16.    In or about July 2007, LACOUR discontinued utilizing **773-414-6221** and commenced utilizing **Target Telephone 1**, based upon call data. On August 5, 2007, at approximately 7:09 p.m., Individual A received an incoming call on **314-973-6580** from LACOUR using **Target Phone 1**.  During this call, Individual A said, "What up FAMO [LACOUR]?" LACOUR responded, "What up dog?"  Individual A told LACOUR that he had started physical therapy to try and help him walk again.  [Individual A had been in a wheelchair due to gunshot wounds, according to agents in St. Louis.] Individual A told LACOUR that he wanted to bring his "lil cousin" and that "he good.  That's why I'm gone bring him."  LACOUR told Individual A to "bring him, make the intro and then that's who gone do it from now on [Individual A would introduce one of his subordinates to LACOUR that would obtain the heroin from LACOUR and transport it back to Individual A]."  Individual A agreed and added, "I still might come" but that when he can't be there it is due to physical therapy.  Individual A further added that the reason he had not "been yet" is because of the physical therapy.  LACOUR responded that he knew that Individual A had "problems on the road one time [referencing Individual A's being stopped by Collinsville Police] and I ain't know what was really going on.  I knew you was going to eventually hit me [call me]."  Individual A assured LACOUR that it was just due to his physical therapy and added "I came and peeped you since then though."  LACOUR agreed and said that they "got to talk about it." Individual A said, "that wasn't really nothing" and "I was just seeing them" and assured LACOUR that they will talk.  LACOUR asked Individual A when he was coming up [to Chicago] and

Individual A told him that if not this week [first week of August 2007], then the next week. LACOUR told Individual A that he would be gone for a couple of days and Individual A then told LACOUR to call him upon LACOUR's return.

17.     On or about August 10, 2007, at approximately 6:55 p.m., Individual A received an incoming call on **314-973-6580**, from LACOUR on **Target Phone 1.** During this call, Individual A said, "What up FAMO?" and proceeded to tell LACOUR that he was going "to make it one day next week [travel to Chicago]." LACOUR told Individual A that he did not "have them shoes [narcotics]" and would "have to pick up them shoes" for Individual A. Individual A reiterated to LACOUR that he was "going to try and make it one day next week." Individual A also told LACOUR "I got you too, I got you too. Everything is straight [money that is owed LACOUR for previous narcotic purchases]." LACOUR asked Individual A if he was "trying to get at the middle of shit?" Individual A told LACOUR that he was going to get "a half order of fried rice. That fried rice be good [half a kilogram of heroin]." LACOUR interjected, "okay, I'll have that for you." Individual A again told LACOUR that he was "going to get a half order of fried rice [half kilogram of heroin]" and told LACOUR to "make sure you go to that China-man [possible reference to china white heroin] to get that motherfucker." The call ended when LACOUR told Individual A to "just let me know what day you are trying to come through, man, so I can clear shit up."

18.     On or about August 24, 2007, Individual A placed an outgoing call from **314-973-5548** to LACOUR on **Target Telephone** 1. During this call, Individual A advised LACOUR that it would be "one day next week." Individual A then told LACOUR, "when you talk to [Individual C], tell him I said what's up." LACOUR responded he "fuck around and be here when you get here, he coming up here to do a little work with me." LACOUR then said, "ok next week,

but uh, down the middle right [reference to half a kilogram]." Individual A agreed.

19.    On or about August 25, 2007, Individual A received an incoming call on **314-973-5548** from Individual B, the target of a Los Angeles FBI drug trafficking investigation, on telephone **310-464-7145**. During the call, Individual B stated, "you better bring me something," and told Individual A that he was "taking too long." Individual A said that he was waiting on "dude," and Individual B responded that "dude was taking too long." Individual A said that he would be leaving the next week to "holler at FAMO [LACOUR]," and that he would also "see [Individual C]." Individual B said that he was "broke, these motherfuckers ready to knock my head off and I can't get a dime." Individual A affirmed that he would be going to Chicago the next week. Individual B responded, "I think you got more than that stashed away on me because I know you had like 250 [$250,000] and I know you are trying to take care of that ugly ho."

**C.    Intercepted Communications Pursuant to 11-5-2007 Order and Surveillance Relating to Lacour's Delivery of Heroin Sample to Individual F**

20.    On November 7, 2007, at approximately 9:35 p.m., LACOUR placed an outgoing call from **Target Phone 1** to Individual F, a Chicago area United Parcel Service (UPS) Delivery Driver. During this call, LACOUR left Individual F a voice mail message telling Individual F, "remember that picture [sample of heroin], don't forget to put that picture...take that picture with you to work." [LACOUR was arranging to meet Individual F on November 8, 2007, to obtain a sample of heroin in order to assess the quality.]

21.    On November 8, 2007, at approximately 9:19 a.m., LACOUR placed an outgoing call from **Target Phone 1** to Individual F. During this call LACOUR asked Individual F, "Shit, you [Individual F] bring that photograph [sample of heroin] out?" Individual F answered, "Yeah, I got

11

it." LACOUR stated, "All right. Cool, cool. Where you at?" Individual F responded, "Right now I'm on 40th and Drake, but there's no telling where I'm going to be. Cause I'm doing them 10-30 packages with them. I just stay spread it out. I just be everywhere [Individual F is delivering UPS packages across the city]". LACOUR stated, "All right. Well I'm going to call you when I get on that side. My man just picked me up from the airport." Individual F said, "Ok, yeah. I'll just tell you where I am." LACOUR then said, "I'll be calling you in about 20 minutes."

22.     On November 8, 2007, at approximately 9:43 a.m., LACOUR placed an outgoing call from **Target Phone 1** to Individual F. During this call LACOUR told Individual F, "I'm on Lake Park and like 39th [LACOUR was arranging to meet Individual F on his UPS route to obtain a sample of heroin]." Individual F said, "Meet on 36th and Ellis."

23.     On November 8, 2007, at approximately 9:50 a.m., surveillance agents observed LACOUR[1] and an unidentified black male driver parked on the side of the street near the intersection of 36th Street and Ellis Avenue, in a newer model, blue Chevrolet Malibu. Agents observed a black, male driving a UPS truck, park on the 3600 block of Ellis Avenue and walk up to the passenger side of the Chevrolet Malibu and speak briefly with LACOUR. Surveillance agents then observed the Chevrolet Malibu and Individual F[2] depart the area separately.

24.     On November 8, 2007, at approximately 3:42 p.m., LACOUR received an incoming call on **Target Phone 1** from Individual F. During this call Individual F asked LACOUR, "What's

---

[1]The identification of LACOUR is based upon his driver's license photograph.

[2]The subscriber of the phone number used by Individual F was an individual who, according to Choicepoint data, is listed as married to Individual F. During the physical surveillance, agents recognized Individual F based upon a driver's license photograph. In addition, Individual F is referred to by his first name in intercepted calls between LACOUR and Individual F.

up G, was it garbage [Individual F is asking about the quality of the heroin sample Individual F delivered]?" LACOUR replied, "Kind of man, but I'm still waiting to see this other thing [arrange another supply of heroin]. I might wanna still have to do [UI] maybe some, but shit [LACOUR might want to purchase some of the heroin Individual F provided a sample of]. I ain't gonna see dude until about 6, so I'm gonna try to line something up. Man, I know you're going to be gone by then." Individual F answered, "Yeah." LACOUR stated, "If I'm gonna do something [purchase heroin from Individual F's connection] I'll either try to have my sister bring you the bread [money] while I'm gone or I'll just let it wait till I get back Sunday." Individual F replied, "All right. It's up to you. If you give it [money] to her, I'll do it [purchase the heroin for LACOUR], but I'm gonna bring [UI] but I'm coming right back with that shit [heroin]. I'm not keeping that shit." LACOUR says, "For sure. I'll know around 6, 7 o'clock what I'm going to do and I'm gonna hit you."

## D. Intercepted Calls Pursuant to 11-5-2007 Order Relating to Arrests of Drug Trafficking Associates

25. On or about November 6, 2007 and on or about November 27, 2007, the FBI Los Angeles, California, the FBI Atlanta, Georgia, the FBI Portland, Oregon and the DEA St. Louis, Missouri conducted multiple arrests of subjects involved in trafficking multi-kilogram quantities of heroin, cocaine and marijuana, as part of a large scale drug conspiracy headed by members of the Black Mafia Family Gang and other groups, including Individual B. DEA St. Louis arrested four subjects and seized approximately 30 pounds (gross weight) of marijuana. FBI Atlanta arrested two subjects and seized two guns and approximately $49,900. FBI Los Angeles arrested 15 subjects, including Individual B, seized 21 guns, approximately 1.5 pounds of marijuana and approximately $100,000. On or about November 27, 2007, FBI Portland arrested 11 subjects, seized two guns and

13

approximately $13, 000.

26.    On or about November 14, 2007, at approximately 11:50 p.m., LACOUR received an incoming call on **Target Phone 1** from Individual A utilizing **314-446-9512**. During this call, LACOUR said "I got a little word. I heard that your cousin got jammed up." Individual A responded, "Nah. They [Law Enforcement] are grabbing a lot of people." LACOUR said, "I heard." Individual A said, "They got all of them "three letters [reference to Black Mafia Family a.k.a. BMF] man." LACOUR said, "Yeah." Individual A said, "They grabbed west coast, east coast, down here. Now they grabbed west coast, east coast, and the A [reference to the arrests that took place in Los Angeles, St. Louis and Atlanta]." At this point, Individual A and LACOUR continued to discuss the number of people arrested in the various takedowns and how they [those arrested] were too "flashy." Individual A said, "My brothers they taught me that. All that flashy shit. The ones [drug dealers] that are quiet [low profile] last long. The ones with the light and the fame, they go faster [get arrested]." LACOUR said, "I am gonna keep my contact with [Individual C] to a minimum right now." Individual A said, "Yeah please do. I am sure that we will call [unintelligible]." At this point, LACOUR and Individual A continued discussing the results of the recent arrests and Law Enforcement's pursuit of Black Mafia Family members, including Individual C. LACOUR said, "No. That is what is up. That is what is up. He [Individual C] understands that is what is up. I mean there are people above him [Individual C] who are really jammed up [arrested] and they got nothing to say [are not cooperating]. I mean shit." Individual A said, "Yeah." LACOUR said, "Yeah as a matter of fact when you do come back, we are gonna go ahead and ride them [cell phones] and live your days again and go to the store together." Individual A said, "Yeah, I was trying to tell you to do that last time. Remember?" LACOUR said, "Shit. You want me to pick up a couple [cell

14

phones]? " Individual A said, "Yeah. Man." Individual A and LACOUR continued to talk about their relationship. Individual A then said, "That is the life we chose [dealing drugs]. You know what I saying. Niggers gotta move." LACOUR said, "Got to make decisions." Individual A said, "Yeah. This is my decision. If it ain't you [dealing directly with LACOUR], I am straight. I am gonna bag that." Individual A and LACOUR continued to discuss if anyone they knew was arrested in the recent take downs.  LACOUR then said, "You stop fucking with all of them [people who were arrested]." Individual A said, "Right. If it ain't you, I am good, I will back the fuck up. No one else I cannot do it, brother. Me and you build that relationship or that bond with one another so that is what it is." LACOUR said, "That is what it is. I am gonna have a couple of them for us [possibly new cellular telephones] when you get here." Individual A said, "OK" LACOUR said, "Yeah. We got sit down for a minute. Cause I got an idea on another just to keep us one level. One more level under it that [another layer of protection from being identified by Law Enforcement] I want to run by you." Individual A said, "OK. That is what is up, Bro."

### E.    Intercepted Calls Pursuant to 11-5-2007 Order Relating to Lacour's Delivery of Heroin to Individual A on November 28, 2007

27.    On or about November 24, 2007, at approximately 11:24 p.m., LACOUR placed an outgoing call on **Target Telephone 1** to Individual A on **314-446-9512**. Individual A said, "What up FAMO [LACOUR]?" LACOUR responded, "What's up dog?" Individual A said, "man, I'd been calling, called you all day. Didn't know if it was a go or not [meeting to conduct a heroin transaction]." LACOUR said, "Yeah, yeah, I just talked to my people [drug supplier]. It is. We all gravy [everything is ready]." Individual A said, "I didn't even leave out tonight that's why, that's why, you know what I'm saying?" LACOUR said, "Nah, I understand, I understand. What ah, when

you want to head this way then?" Individual A responded, "Shit, I'm gonna call you tonight, might head that way early in the morning." LACOUR said, "Okay, for sure. Let me know, so I could tell." Individual A said, "Answer your phone, man, answer your phone." LACOUR said "Man, the motherfucker had died on me, I left it at home earlier today and then I guess it was on vibrated, I saw I missed some calls. When I was trying to call you back my shit [cellular telephone] died on me. I just plugged it up, jumped in the shower. Give it a little time to juice up. And, ah, I'm good, I'm gonna make sure this boy [cellular telephone] got juice [power] though." Individual A said, "Okay bro, I'm gonna call you tonight and let you know something [whether or not he will make the trip to Chicago]."

28.     On or about November 24, 2007, at approximately 11: 42 p.m., LACOUR placed an outgoing call on **Target Telephone 1** to Individual A on telephone number **314-446-9512**. LACOUR said, "Shit, I was gonna let you know, man. I fitting to step out [leave his residence] but this phone, I have to leave it here to charge so if I don't answer, you could just text me a message, let me know, you know, like what time [when Individual A will be proceeding to Chicago to conduct a drug transaction as set forth above]." Individual A answered, "Okay, that's what it do." LACOUR asks, "You think you coming tomorrow though?" Individual A said, "Where you stepping out to? Yeah, I'm checking on everything [collecting drug proceeds to finance this pending heroin transaction] right now, right." LACOUR said, "Okay." Individual A said, "I'm checking on everything right now, so, That's what I do, I'll text you [text message over cellular telephone device], whatever, know what I'm saying, let you know everything." LACOUR said, "That way when I get back to the phone, I at least could see it cause it probably be late." Individual A responds, "Okay."

29.     On or about November 25, 2007, at approximately 6:53 p.m., LACOUR placed an

outgoing call on **Target Telephone1** to telephone number **314-446-9512**, believed to be utilized by

Individual A. LACOUR said, "Yeah, Wednesday all good." Individual A said, "Okay, that's way

they do it." LACOUR asked, "So, you'll come Tuesday night?" Individual A answered, "Yup."

LACOUR said, "Okay, cool. No problem." Individual A said, "Yup." LACOUR asked, "Hey, um,

you gonna be able to bring that other piece of change [money that is owed for prior drug

transactions]?" Individual A said, "What piece of change?" LACOUR said, "We still out a stack

[Individual A owes LACOUR $1,000]?" Individual A said, "Ah, we sure is. Yeah, yeah. Well this

what it be then right, ah, I'll gather, so it'll be like ah, I gathered 44 [collected $44,000] right, so it

be like 43 [$43,000] then." LACOUR said, "Okay." Individual A said, "[unintelligible] do what you

can so I can get you out the way [all paid up]." LACOUR said, "For sure, for sure. Now I'm gonna

call you and let you know. I hoping that everything would be the same. He [heroin supplier] say,

he tellin' me it [heroin] supposed to be, this shit [heroin] supposed to be like way better than anything

we've had [previous heroin purchases]. Like, after you see it [heroin]. He tellin' me I won't have no

problem [selling the heroin] with it but ah, I'm tellin' him that we been on the same page all the time.

Really ain't tryin' to go up [price], we tryin' to go down [price]." Individual A responded, "Yeah,

God damn." LACOUR said, "Right, but I'm tryin' to see if I can't keep it to a minimum [price] and

hope we won't even have to pass that on." Individual A said, "Alright." LACOUR said, "But, ah,

just in case, I'll let you know. I'm still kinda doing a little negotiating [price of heroin] with him

[supplier] on this side." Individual A said, "All right." LACOUR said, "So, um. Let, me see what

I can find out. But, ah, you know. I just wanted to put that in your ear just in case so it don't come

out of nowhere [the set price of the heroin]." Individual A said, "Okay, okay. We'll see. Let me

know then bro." LACOUR said, "For sure. I got you then, ah, shit I see you Wednesday."

17

Individual A said, "Okay, bro."

30.    On or about November 26, 2007, at approximately 12:32 pm., LACOUR placed an outgoing call on **Target Telephone 1** to Individual A who was using **314-446-9512**. During this call, LACOUR told Individual A "It's a go [heroin for cash transaction]." LACOUR further explained that "You [Individual A] run it [the money] to me when you get in at night and I'll have it [the heroin] for you when you wake up in the morning." Individual A confirmed "Ok that's what it do Bro."

31.    On November 28, 2007, at approximately 4:13 a.m., LACOUR received an incoming call on **Target Telephone 1** from Individual A who was using **314-446-9512**. During this call, LACOUR and Individual A agreed to meet at 10:00 a.m.

32.    On this same date, at approximately 8:58 a.m., surveillance agents, who began observing LACOUR on November 27, 2007 at approximately 1:30 p.m., observed LACOUR driving a 1993 Volkswagen Passat, bearing Illinois temporary registration 883H733 (hereinafter "IL 883H733"), enter a parking lot at East Hyde Park Blvd. and South Lake Park Ave. in Chicago, Illinois, and park at an "Original Pancake House" located at 1517 East Hyde Park Blvd. Surveillance agents observed LACOUR enter the restaurant, sit alone throughout his stay and use his cell phone several times. At approximately 9:35 a.m., surveillance agents observed LACOUR exit the restaurant and depart the area.

33.    At approximately 9:36 a.m., LACOUR placed an outgoing call on **Target Telephone 1** to telephone number **314-446-9512,** believed to be utilized by Individual A. During this call, Individual A told LACOUR that he ended up in downtown Chicago at the Conrad Hotel on Rush and Grand Streets, paying $600 for a room. LACOUR told Individual A that he would call

18

Individual A when he was downstairs.

34.    At approximately 9:51 a.m., LACOUR placed an outgoing call on **Target Telephone 1** to Individual A at **314-446-9512**. During the call, LACOUR confirmed that Individual A was at the Conrad Hotel on Rush and Grand Streets. LACOUR asked Individual A for the room number and Individual A told LACOUR that the room number is 916 and that the hotel is by the Nordstrom's building.

35.    At approximately 9:55 a.m., surveillance agents observed LACOUR park in the turnaround at the Conrad Hotel located at 521 North Rush Street, Chicago, Illinois. Agents observed LACOUR exit the vehicle bearing plate IL 883H733 and enter the hotel. At approximately 10:12 a.m., surveillance agents observed LACOUR exit the Conrad Hotel, enter the vehicle bearing plate IL 88H733 and depart the area. At approximately 10:26 a.m., surveillance agents observed the vehicle bearing plate IL 88H733 in the street with its hazard lights on in front of a residence located at 1367-65 East 48th Street, Chicago, Illinois. Approximately two minutes later, surveillance agents observed LACOUR exit the residence and enter the vehicle bearing plate IL 88H733. At approximately 10:37 a.m., surveillance agents observed LACOUR arrive back at his residence, 1603 East 55th Street, Chicago, IL and park in spot #2, behind the residence.

36.    On or about November 28, 2007, at approximately 10:50 a.m., LACOUR placed an outgoing call on **Target Telephone 1** to Individual A at **314-446-9512**. During this call, LACOUR told Individual A that Individual A "might want to check your bag [used to conceal drug proceeds]" because "that last one wasn't all 100's [$100 bills]. The first three were all 100's and the last one had some 20's [$20 bills] in it. It was only 8200 [$8,200] in the last one." Individual A responded, "for real." LACOUR said, "Yeah, so it's 38,2 [$38,200] total and then that seven [$700] you gave me."

19

Individual A asked, "so I owe you 200 [ $200]?" LACOUR said, "you owe me 1800 [$1800] if you were trying to give me 40 [$40,000]." LACOUR told Individual A that, "the one on the bottom was 900 [$900] worth of 20's and then it is like 74 [$7,400] worth of 100's." Individual A said, "that's all [money] I have on me." LACOUR said, "It came out to 80, it was 73 in 100's and 900 in 20's, 8200 [$8200]. That last one [stack of money] was supposed to be 10 [$10,000]." Individual A said, "how that happen?" LACOUR said, "next time we should've counted [the money] right there since we had a room [hotel]." Individual A said that he "wasn't playin' no games wit' it, I run it [bring the money owed] back to you. That ain't no problem." LACOUR told Individual A that he, "had said 433 [$43,300] instead of 444 [$44,400]" because he thought Individual A was "coming with 40 [$40,000] total. One [$1,000]" for LACOUR and "39 [$39,000] for the thing [heroin]." Individual A said he was coming with "all 40 and 1 you." LACOUR said he made a mistake and will see what he can do, to see if he can catch "them" [heroin supplier] and have them bring the extras [heroin]."

37.     At approximately 12:08 p.m., surveillance agents observed LACOUR exit the front common door to his apartment complex, and enter a yellow taxi cab number 6319, bearing Illinois taxi registration 6319TX. At approximately 12:26 p.m., surveillance agents observed the taxi drop LACOUR off at the front entrance to the Conrad Hotel. LACOUR entered the hotel. At approximately 12:33 p.m., surveillance agents observed LACOUR exiting the elevator and walking towards another set of elevators leading to the exit of the Conrad Hotel (the lobby to the hotel was on the 5th floor and access to all the hotel rooms is available from a set of elevators near the lobby).

38.     At approximately 12:55 p.m., surveillance agents observed a black male, wearing a du-rag and a black jacket with white stripes (later identified as Individual H) exit the front entrance of the Conrad Hotel and hand a valet attendant a ticket. Surveillance agents observed Individual H

waiting near the hotel entrance as the valet attendant ran across Rush Street to the parking garage. A short time later, surveillance agents observed the valet attendant pull up to the front of the Conrad Hotel in a silver Chevrolet Impala, bearing Missouri registration 224YHM, registered to Alamo Financing, 10124 Natural Bridge, St. Louis, MO (hereinafter "MO 224YHM"). Surveillance agents observed LACOUR approach the front of the hotel, crossing Rush Street from the west, carrying a white bag, with gold letters, labeled "T-Mobile." At this time the valet attendant exited the vehicle bearing license plate MO 224YHM, Individual H and LACOUR spoke briefly, Individual H entered the vehicle bearing license plate MO 224YHM and departed, and LACOUR entered the hotel. At approximately 1:05 p.m., surveillance agents observed the vehicle bearing license plate MO 224YHM return to the valet area of the hotel entrance. Surveillance agents observed the vehicle bearing license plate MO 224YHM re-enter the valet area of the hotel entrance. Agents observed Individual H exit the vehicle bearing license plate MO 224YHM, obtain another valet ticket and enter the hotel.

39.    At approximately 1:10 p.m., surveillance agents observed LACOUR exit the front of the Conrad Hotel, carrying the white bag described above, enter a taxi bearing number 2182, and depart the area. At approximately 1:25 p.m., surveillance agents observed the taxi arrive at 1603 East 55th Street, LACOUR's residence. LACOUR exited the taxi and entered the residence through the front common door. At this time, surveillance of LACOUR was terminated.

40.    At approximately 1:45 p.m., surveillance agents observed Individual A and Individual H exit the Conrad Hotel, enter the vehicle bearing license plate MO 224YHM and depart the area. At approximately 3:15 p.m., Illinois State Police (working under the FBI's direction) conducted a traffic stop of the vehicle bearing license plate MO 224YHM, for a traffic violation, on Southbound

21

US 55 just south of Highway 52. Illinois State Police identified the occupants of the vehicle as Individual A and Individual H. A narcotics detection canine indicated positively for the presence of a narcotics odor on the vehicle. Consensual searches of the vehicle, Individual A and Individual H were negative for contraband other than a small amount of loose marijuana, leading agents to believe the heroin obtained from LACOUR was secreted in a hidden compartment.

41.    As set forth in this affidavit, I believe the facts establish probable cause that LACOUR did commit a violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.


Eric J. McIntosh
Special Agent, Federal Bureau of Investigation


SUBSCRIBED AND SWORN TO BEFORE ME
this 13th day of February, 2008


Maria Valdez
United States Magistrate Judge

22